**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JENNIFER FORMENTIN,

                                   CASE NO. 15-12182

        *Plaintiff*,              DISTRICT JUDGE LINDA V. PARKER
*v.*                               MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 13, 15)**

## I.      RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Formentin is not disabled. Accordingly, **IT IS RECOMMENDED** that Formentin's Motion for Summary Judgment (Doc. 13) be **GRANTED**, that the Commissioner's Motion for Summary Judgment (Doc. 15) be **DENIED**, and that this case be remanded for an award of benefits.

## II.     REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title

II, 42 U.S.C. § 401 *et seq*. and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381 *et seq*. (Doc. 6; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 15).

Plaintiff Jennifer Formentin was thirty-seven years old as of March 10, 2014, her date of alleged disability. (Tr. 15, 161). Her applications for benefits were initially denied on June 30, 2014. (Tr. 69-90). Formentin requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Anthony R. Smereka on September 22, 2014. (Tr. 29-68). Formentin, represented by attorney Marcus Cooper, testified, as did vocational expert ("VE") Cheryl Mosley. (*Id*.). On January 28, 2015, the ALJ issued a written decision in which he found Formentin not disabled. (Tr. 13-23). On February 4, 2015, the Appeals Council denied review. (Tr. 1-3). Formentin filed for judicial review of that final decision on June 16, 2015. (Doc. 1).

### B.     Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept

2

as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

3

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual

4

functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241

(citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Formentin not disabled

under the Act. (Tr. 23). The ALJ found at Step One that Formentin had not engaged in

substantial gainful activity following the alleged onset date, March 10, 2014. (Tr. 15). At

Step Two, the ALJ concluded that Formentin had the following severe impairments:

"degenerative disc disease of the lumbar spine with radiculopathy; asthma; and diabetes

mellitus." (*Id.*). At Step Three, the ALJ found that Formentin's combination of

impairments did not meet or equal one of the listed impairments. (Tr. 17). The ALJ then

found that Formentin had the residual functional capacity ("RFC") to perform light work,

except that Formentin "can lift up to 15 pounds occasionally; she requires a sit/stand

option permitting her to perform the work either sitting or standing and allowing for a

change of position every 30 minutes; she cannot work with hazards, including work at

unprotected heights or around dangerous, moving machinery; she cannot climb ladders,

scaffolds, or ropes; she can occasionally climb ramps and stairs; she can occasionally

balance, stoop, kneel, and crouch; she cannot crawl; she cannot drive during the course of

employment; she cannot have concentrated exposure to vibration;  she cannot have

concentrated exposure to dust, fumes, odors, humidity, or wetness; and she cannot have

exposure to temperature extremes." (Tr. 17-21). At Step Four, the ALJ found that

Formentin was not able to return to her past relevant work as a customer service

representative. (Tr. 21). At Step Five, the ALJ found that Formentin could perform several positions which exist in substantial numbers in the national economy. (Tr. 22).

### E.   Administrative Record

#### 1.   Medical Evidence

In April 2012 Formentin was involved in a motor vehicle accident, and visited a hospital's urgent care clinic for treatment of headache and chest pain. (Tr. 264). The following day she returned, complaining of some low back and neck pain, with six out of ten pain. (Tr. 264). An MRI of Formentin's spine showed "reversal of the cervical lordosis with anterolisthesis of C2 on C3 as well as C3 on C4." (Tr. 265). Formentin returned to work on the following week, where she found it difficult to sit, and thus sought a work note. (Tr. 268). In May 2012 she reported eight out of ten pain along with lower back pain and spasms. (Tr. 268-69). X-rays showed some degenerative arthritis, mild degenerative changes of the mid-lumbar spine, and normal variant lumbarization of the S1 segment. (Tr. 269-70). Also in May 2012, Formentin reported using a back brace, Flexeril, and Norco to treat her back pain, but was "still in a great deal of pain and had back spasms all night long." (Tr. 272). She also reported that her back pain was so severe that she was unable to attend physical therapy. (*Id*.).

In May 2012 Formentin told her physical therapist that her pain ranged from six to ten out of ten. (Tr. 369). Her tolerance for lifting, sitting, and walking was severely reduced. (Tr. 370).

In June 2012 Formentin Dr. John Corrigan interpreted an MRI of Formentin's spine, which showed "[m]ild multilevel spondylotic and degenerative changes" along with a mild broad-based protrusion at L2-L3 with a small central herniation with caudal migration, and mild disc space narrowing, and endplate degenerative changes. (Tr. 306).

Dr. Joseph Crow wrote in July 2012 that Formentin would be able to return to work the following day, but with a limitation to repetitive squatting, bending, lifting, no lifting over five pounds, no prolonged standing, with frequent breaks, a reduction in weekly hours; those restrictions would last until October 2012. (Tr. 301). During a following-up visit in October, those restrictions were lifted. (Tr. 302).

Also in July 2012, Dr. Crow noted that Formentin was doing somewhat better, but had difficult with bending over and prolonged sitting. (Tr. 307). Later that month, Formentin complained of ten out of ten pain. (Tr. 309). Dr. Crow gave Formentin a work note providing that she required more breaks, could not sit or stand for prolonged periods, could not lift weight above five pounds, and should work only thirty hours per week. (*Id.*).

In August 2012 Dr. Crow noted some disc herniation of the lumbar spine, along with some possible tears. (Tr. 311). Formentin had been attending physical therapy and using a TENS unit to relieve pain, but found that those therapies were exacerbating her pain. (*Id.*). Formentin had undergone several pain relieving injections over the prior weeks, and requested another injection during her assessment. (*Id.*). Formentin had some balance and leg weakness issues, along with a propensity to trip and fall. (*Id.*). She spent

her weekends lying in bed from intense pain, and cried from the intensity of her pain. (*Id*.). Dr. Crow noted that her gait was unsteady and slow, with wobbling and diminished patellar reflexes in the right lower extremity. (*Id*.). Having found that Formentin's pain was not responding to conservative therapy, Dr. Crow recommended her to the pain clinic and neurosurgeon. (*Id*.). Formentin complained of numbness and tingling in the lower right extremity, and reported nine out of ten pain. (Tr. 328). During physical therapy, Formentin complained of seven to nine out of ten pain. (Tr. 381).

In September 2012 Formentin was noted to be in severe pain, had difficulty walking, cried due to pain, and visited urgent care for treatment of a back spasm. (Tr. 314). Later that month, Formentin fell while at home because of pain, and visited the emergency room; she was then taking three Norco pills daily to treat pain. (Tr. 316).

In October 2012, Dr. Crow noted that Formentin was still suffering from chronic low back pain with radiation into the right leg. (Tr. 303). Formentin noted at that time that injections into her lower back provided some temporary relief, but wore off after about two weeks. (*Id*.). Formentin's symptoms were noted to be consistent with her prior complaints, and simply had not improved. (*Id*.). She had difficult "with waking and any kind of lifting." (*Id*.). She was taking Percocet and Norco, along with occasional use of Skelaxin and Naproxen. (*Id*.). Formentin was able to work thirty-two hours per week with limitations, though she did miss one day due to pain. (*Id*.). Her pain was still recorded at eight out of ten. (*Id*.).

8

In November 2012 Dr. Crow noted complaints of continued severe pain, and complained of nine out of ten pain. (Tr. 324). Formentin wondered whether she was a candidate for back surgery. (*Id.*). Formentin was discharged from physical therapy having not met her goals; she was still reporting nine out of ten pain at that time. (Tr. 388).

A December 2012 MRI of the lumbar spine revealed a slight increase when compared to Formentin's June 2012 scan. (Tr. 326). She was in no apparent distress and her lower extremity strength was normal. (Tr. 327). Formentin was found to suffer from lumbar "radiculopathy and sacroiliitis of the right joint;" she was given a TENS machine and scheduled for epidural steroid injections. (*Id.*). Formentin complained to Dr. Crow of severe low back pain and moderate posterior right thigh pain, which persisted despite use of Percocet, lidocaine patches, Vicodin, Naproxen, Skelaxin, and a TENS unit. (Tr. 329). Physical therapy did not provide relief. (Tr. 329). That same month, Dr. Mokbel Chedid noted disc herniation, lumbago, and multiple disc degeneration; Formentin complained of nine out of ten pain. (Tr. 330).

Dr. Crow also drafted numerous work notes for Formentin. On July 24, 2012, he recommended that Formentin could return to work the following day with a five pound lifting restriction, no sitting for longer than two hours, frequent breaks, a reduction in weekly hours, no repetitive squatting, bending, lifting, and that this restriction would remain in effect until October 24, 2012. (Tr. 769). A few days later, Dr. Crow drafted a revised work note stating that, in addition to the prior restrictions, Formentin would require breaks every two hours for fifteen minutes, should work no more than thirty-two

9

hours per week, and that the restriction would remain in effect until October 2012. (Tr. 770). These restrictions were extended to January 2013. (Tr. 771).

In January 2013 Formentin experienced numbness and pain in the right leg, nine out of ten pain, and weakness in general "with some episodes of falling." (Tr. 333). Dr. Crow recommended that Formentin consider going on "short-term disability for 3-6 months and follow-up with Pain clinic for injections." (*Id*.).

On January 30, 2013, Dr. Crow drafted a medical request form in which he noted that Formentin was restricted to no repetitive bending, lifting, or squatting, should not engage in prolonged standing; required frequent breaks; and reduced weekly hours. (Tr. 773). Dr. Crow also noted that Formentin's pain condition was worsening. (*Id*.).

Also in January 2013, Dr. Seven Harwood noted that Formentin's pain was persistent and had gradually worsened. (Tr. 408). He expressed concern that physical therapy would be of limited benefit. (Tr. 410). Dr. Harwood performed an electromyogram, which showed largely normal results, but with some polyphasic motor units in the right quadriceps. (Tr. 411). Despite finding no evidence of lumbar radiculopathy, Dr. Harwood recommended another epidural for treatment of her spinal disc protrusions and bulges. (*Id*.).

In February 2013 one of Formentin's physicians found that she was not a candidate for surgery because her spine did not show evidence of root compression, despite generative changes at L2-L5 and a broad based disc protrusion at L2-L3. (Tr.

10

274). A scan of her right knee showed no fracture, dislocation, or subluxation, but with a small suprapatellar effusion. (Tr. 336).

Formentin returned to physical therapy in March 2013; her ability to lift, walk, and sit continued to be severely reduced. (Tr. 394). She experienced a fall at home and suffered a small tear of the medial meniscus. (Tr. 404). Also in March 2013 Dr. Harwood noted that Formentin's pain was moderate in severity, which was aggravated by bending and doing housework. (Tr. 420).

In May 2013 Formentin presented to Dr. Crow complaining that her pain was "no better" than before, and rated at nine out of ten across her lower back and into her right leg. (Tr. 337). Formentin said that she had returned to work, but found it necessary to get up several times daily to stretch and walk, and that her pain increased as the day wore on. (*Id*.). Dr. Crow noted that, despite her pain, Formentin was "actually very productive right now," because she was working full time, going to classes, and had been helping her elderly father to pack up his house, cleaning, and mowing the lawn. (*Id*.). Dr. Crow found that this reflected a "disconnect in terms of how much she is doing compared to how much pain she is in." (*Id*.). Dr. Crow's final note states that he was "[n]ot sure what other treatment options might benefit," but recommended that Formentin continue to follow up with the pain clinic. (Tr. 339).

Also in May 2013 Formentin was again discharged from physical therapy, this time having "partially met" her therapy goals. (Tr. 396). She continued to experience pain up to nine out of ten, and it was noted that strengthening her core was difficult due to

11

pain. (*Id*.). Formentin also suffered a fall and sought hospital treatment. (Tr. 557). Dr. Jerry Huss noted that Formentin's narcotic treatment regimen was not remedying her pain, that Formentin's sciatica right leg pain had persisted for thirteen months, but that she was cleaning her father's house against medical advice. (*Id*.). Dr. Harwood noted that Formentin's dull aching pain was gradually worsening, and was moderate to severe. (Tr. 422).

In June 2013 Formentin again sought hospital treatment, reporting low back pain which worsened over time resulting from "some long distance driving" and "working a lot." (Tr. 580). She requested further narcotic treatment in addition to her Percocet, MS Contin, and Skelaxin, to "take the edge off." (Tr. 571). Dr. Brian Frol noted Formentin's low back pain, and found that her "extremely low risk" diagnoses indicated that further testing and treatment was unnecessary at that time. (Tr. 573). Formentin was discharged without being given any additional prescriptions. (*Id*.).

In July 2013 Formentin sought treatment from urgent care because of difficulty walking due to severe leg pain. (Tr. 341). Formentin was still making use of Percocet, morphine, and pain relieving injections. (*Id*.). Despite her pain, Formentin was working thirty-two hours per week, though she also complained that this work aggravated her pain. (*Id*.). Later that month, Formentin returned to Dr. Crow, still complaining of constant, burning, shooting pain radiating from her back into her right leg, at nine out of ten severity. (Tr. 343). Formentin tested positive for the straight leg raise test on her right leg. (*Id*.). Dr. Crow noted that Formentin's pain had persisted for one year. (*Id*.).

12

Formentin sought hospital treatment in July 2013, where it was found that her pain was "not progressively worse," despite Formentin rating her pain at ten out of ten. (Tr. 585, 589).

In August 2013 Dr. Harwood again noted that Formentin's pain was moderate to severe, and had not changed from her prior visit. (Tr. 424). Her pain was aggravated by weight lifting, prolonged standing, sitting, twisting, and bending. (*Id*.). Formentin had "exhausted all treatments" at that stage. (*Id*.). Dr. Harwood limited Formentin to working thirty-two hours per week and lifting no more than fifteen pounds. (Tr. 425).

Formentin repeatedly visited urgent care clinics for treatment of back pain, among other ailments throughout 2012, 2013, and 2014, totaling over fifteen visits. (Tr. 426-555). She was generally given narcotic pain medication and sent home. (*Id*.).

In January 2014 Formentin again sought hospital treatment, reporting three to four days of worsening low back pain with radiation into the right foot. (Tr. 597). She was then taking Percocet every six to eight hours, and MS Contin at night. (*Id*.). Formentin was unable to bend at the waist, which was aggravated by a recent fall on the ice. (*Id*.). Also in January 2014, Dr. Crow diagnosed uncontrolled asthma. (Tr. 673). Later that month, Formentin sought treatment for a migraine which produced ten out of ten pain. (Tr. 680).

A March 2014 MRI scan of Formentin's lumbar spine showed signs of levoscoliosis with advanced degenerative disease at L2-L3, along with bulging discs at L2-L3 and L4-L5 which were unchanged when compared to a 2012 study. (Tr. 758).

13

However, Formentin's previously seen central disc protrusion at L3-L4 was "much smaller," and had reduced to a "mild broad-based bulging disc with mild sac compression." (*Id*.). Formentin also showed mild degenerative changes of facet joints at all three aforementioned levels. (*Id*.).

In May 2014, Formentin treated with a hospital for migraine pain, and returned the following day after vomiting due to continuing migraine pain. (Tr. 656).

In April 2014 Formentin again reported persistent back pain which had neither improved nor worsened recently. (Tr. 637). Dr. Harwood found that Formentin was not a surgical candidate, and that she was no better than the first time he treated her. (Tr. 637-38). She again sought hospital treatment for her pain, this marked her fifteenth visit to urgent or emergency care. (Tr. 661). Formentin described her pain as worse than usual; she was given Toradol and Dilaudid and was advised to see her primary care physician soon thereafter. (Tr. 664). Dr. Crow noted in April 2014 that Formentin's pain had been "gradually worsening," such that she could barely move due to pain some days. (Tr. 688). That same month, Dr. Crow noted that her pain had been "waxing and waning for almost 2 years," and that Formentin fell the week prior which aggravated her pain. (Tr. 709). At that time, he noted that her pain was worsening, and that Formentin's pain rated at ten out of ten. (*Id*.). Formentin returned to Dr. Crow following three emergency room visits for an update to her medication. (Tr. 717). Formentin reported that use of morphine and Valium together permitted her to rest for up to six hours, though sometimes even that combination would fail to relieve her pain. (*Id*.). Formentin was found to be taking

14

college classes, but withdrew because prolonged sitting caused back pain. (*Id*.). Formentin was found to walk slowly and with a slight limp. (*Id*.). In late April 2014 Formentin again treated with Dr. Crow following a slip and fall onto her hip. (Tr. 747). Valium and morphine helped her pain, but she was limited in the frequency with which she could take that medication because it prevented her from driving. (*Id*.).

Formentin again sought hospital treatment in May 2014 for severe migraine pain, possibly the product of influenza. (Tr. 732).

In June 2014, Formentin again returned to the hospital for treatment complaining of low back pain. (Tr. 647). She was prescribed with Tramadol and discharged. (Tr. 650).

In July 2014, Dr. Crow evaluated Formentin for an insurance claim with her vehicle insurance company. (Tr. 759). Dr. Crow noted chronic back pain and bulging discs which had not responded to conservative therapy, and which could not be corrected surgically. (*Id*.). Formentin's symptoms included numbness, tingling, weakness in the right leg, gait instability, and low back pain. (*Id*.). Dr. Crow found that Formentin was only at twenty-five percent of full functioning, and was "getting worse." (*Id*.). He also found that Formentin could not perform prolonged standing, sitting, lifting, or driving while on pain medications, and could "barely move without falling or aggravating pain." (Tr. 760). In his disability certificate, Dr. Crow found that Formentin would require twelve hours per day of attendant care through July 16, 2015, would require replacement services seven days per week throughout that same period, and should not perform prolonged standing, sitting or lifting. (Tr. 761).

15

An August 2014 consultative record produced by Dr. Hazem Eltahawy indicated that Formentin reported "progressively worsening" pain in her back and lower right leg. (Tr. 780). Dr. Eltahawy noted advanced degenerative processes at L3-L4, along with uptake in the same region. (*Id*.).

Formentin underwent a consultative evaluation with Dr. Michael Geoghegan in December 2014. (Tr. 785). Dr. Geoghegan noted that Formentin had moderate difficulty getting on and off the examination table, performing heel and toe walking, squatting, and hopping. (Tr. 783). She showed a mild right sided limp, but did not use an assistive device to walk. (*Id*.). Formentin showed limited range of motion in the lumbar spine only. (*Id*.). Her grip strength was reduced by half bilaterally. (*Id*.). Dr. Geoghegan found that Formentin could sit for twenty minutes, stand for twenty minutes, and walk less than one block. (Tr. 784). In an eight-hour day, she could sit for four hours, stand for four hours, and walk for two hours. (Tr. 786). She could lift a gallon of milk with her upper left extremity, but no weight with the upper right. (Tr. 784). She slept in one hour spurts, and usually got four to five hours of sleep. (*Id*.). Her lower extremity strength was largely normal. (Tr. 785). Dr. Geoghegan found that Formentin could complete "all tasks asked of her with moderate difficulty." (*Id*.). In terms of lifting capacity, Formentin could lift or carry up to twenty pounds occasionally, but could never lift more than twenty pounds. (Tr. 787). She could use either upper extremity to frequently reach, handle, finger, or feel, but could only push and pull occasionally with those limbs. (Tr. 788). She could use her right foot occasionally, but left foot frequently. (*Id*.). She could occasionally climb stairs

16

and ramps, balance, stoop, kneel, crouch, and crawl, but never climb ladders. (Tr. 789). In terms of environmental limitations, she could never be around unprotected heights, but could occasionally perform in all other environmental conditions. (Tr. 790).

### 2.   Application Reports and Administrative Hearing

#### a.   Formentin's Function Report

Formentin completed a function report on June 3, 2014, in which she asserted that she was prevented from working by her lower back pain, which prevented her from bending or lifting more than ten pounds. (Tr. 226). Formentin spent her days performing errands with her fiancé, picking up her niece from school, watching her niece after school, and attending doctor's appointments. (Tr. 227). Her pain prevented her from bending, bowling, and sitting for more than thirty minutes. (*Id.*). She could dress, do her hair, and feeds herself without issue, but had problems getting in and out of the shower, lifting off of the toilet, and bending to shave her legs. (*Id.*). She prepared simple meals daily, and as to chores she was able to do laundry and clean the sinks and mirrors. (Tr. 228). Formentin left her home daily, could drive a car, and could go outside alone. (Tr. 229). She shopped in stores for food for an hour weekly. (*Id.*). Her sole hobby was watching television, though she also went to the mall with her fiancé's niece weekly, Walmart twice weekly, and church on Sunday. (Tr. 230). She reported problems lifting, standing, bending, squatting, reaching, sitting, and completing tasks. (Tr. 231). She used a brace for her left knee for stability. (Tr. 232).

#### b.   Formentin's Testimony at the Administrative Hearing

17

At the September 22, 2014, hearing before the ALJ, Formentin testified that she lived in a cabin with one set of stairs between the upper and lower floors. (Tr. 40). She was able to climb the stairs with difficulty resulting from her back pain. (*Id.*). Formentin's back pain ranged between eight-and-one-half to nine out of ten, which resulted in difficulty sleeping. (Tr. 41). The pain ranged from her lower lumbar area down through the right leg and foot. (*Id.*). By the time of the hearing, Formentin was "not on any pain medications" as the result of a stomach ulcer beginning in May 2014, and thus could manage her pain only by avoiding movement. (*Id.*). She found it necessary to lean leftward while sitting to avoid pressure on her right leg, and regularly shifted position to relieve pain. (Tr. 42). She spent three to four hours daily laying down or using ice. (Tr. 43). She missed approximately one day of work per week following her car accident. (*Id.*). She was terminated from her work shortly thereafter, but could not recall the reason for her termination. (Tr. 44). She elevated her legs at night and during the day. (Tr. 45). She experienced difficulty bending over, climbing stairs, and balancing. (Tr. 55). Formentin stated that she suffered falls "plenty of times," into doors, in the shower, and when getting out of her car. (Tr. 55).

Formentin also testified that she suffered from migraines on a monthly or bi-monthly basis, which lasted from one to four days. (Tr. 45). These migraines caused nausea and pain, and were alleviated by sleep and remaining in a dark room. (Tr. 45-46). She also testified to suffering from COPD, which limited her ability to walk even short distances, including to her mailbox or up the stairs. (Tr. 47). She also experienced chronic

18

bronchitis every month or two. (Tr. 48). She also suffered from diabetes, but did not experience any significant symptoms resulting from this condition. (Tr. 51).

Formentin could lift a gallon of milk, and could likely lift up to ten pounds. (Tr. 50). She could still drive. (Tr. 51). Formentin stated that she could not return to her thirty-two-hour-per-week position as a receptionist because she was unable to sit for longer than an hour. (Tr. 50). When asked whether she could return to her work as a receptionist if provided with a sit-stand option, Formentin stated that she was unsure, because her pain ranged between moderate and severe. (Tr. 52). Formentin had recently moved and had not sought treatment from a physician in her new city. (Tr. 53).

As to her emotional health, Formentin stated that she suffered from depression which sometimes caused her to "break into tears for no apparent reason." (Tr. 54).

Formentin also testified that she took several college classes from 2012 through March or April 2014, but dropped out because her back pain prevented her from sitting for the duration of her classes. (Tr. 56-58).

### c.    The VE's Testimony at the Administrative Hearing

The ALJ then made use of the services of a VE. The VE determined that Formentin's past relevant work as a customer service representative was semi-skilled work, and "per her testimony" that she lifted paper exceeding ten pounds, was performed at the light level of exertion. (Tr. 64). However, the VE also testified that the work was "generally sedentary." (*Id*.).

19

The ALJ then asked the VE to assume a person of similar age, education, and work experience to Formentin, and based a series of hypothetical questions upon this hypothetical worker. (Tr. 62). The ALJ's first hypothetical contained the following limitations: the worker could perform light work, but would be limited to lifting fifteen pounds; she would have to be able to alternate sitting or standing every thirty minutes; could not work in proximity to unprotected heights, vibration, fumes, odors, humidity, wetness, or dangerous machinery; could not climb ladders, ropes, scaffolds; could only occasionally climb ramps and stairs; could occasionally balance, stoop, kneel, and crouch, but never crawl; could not drive in the course of her employment. (Tr. 63). The VE found that these restrictions would preclude Formentin returning to her past relevant work as actually performed, but would not preclude working as a customer service representative as generally performed. (Tr. 64). The VE also testified that the hypothetically limited worker could also work as an information clerk (4,400 jobs in Southeastern Michigan) and order caller (6,400 jobs). (*Id*.).

The ALJ then modified the hypothetical such that the worker was limited to sedentary work, in addition to the other aforementioned restrictions. (Tr. 64-65). The VE found that such a worker could still perform work a telephone quotation clerk (4,400 jobs), or document preparer (6,400 jobs). (Tr. 65).

The VE also testified that employers tolerate a maximum of two absences monthly. (Tr. 66). Formentin's attorney then asked whether a worker who was off task one third of the day due to pain would be precluded from competitive employment; the

20

VE confirmed that this restriction would eliminate all available positions. (*Id.*). Likewise, the need to elevate one's hip to waist level for two hours daily would be work-preclusive. (*Id.*).

### F.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

21

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

22

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

23

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

24

(v)   Treatment, other than medication, . . . received for relief of . . .
pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027,
1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the
claimant's work history and the consistency of his or her subjective statements are also
relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the
groundwork for this, stating, "An individual shall not be considered to be under a
disability unless he [or she] furnishes such medical and other evidence of the existence
thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482
U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her]
limitations," and is measured using "all the relevant evidence in [the] case record." 20
C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all
credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human
Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-
14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

G.   **Analysis**

Formentin makes a great number of arguments in the brief supporting her motion
for summary judgment. (Doc. 13). These arguments frequently flow into one another, and
several are merely alluded to in a single sentence; those underdeveloped arguments will,
for the reasons discussed below, be considered waived. More substantively, Formentin

25

argues that the ALJ erred in the following ways: 1) Failing to find that Formentin's mental disorders were "severe" within the meaning of the regulations; 2) Failing to provide reasons for the finding that Formentin did not meet a listing at Step Three; 3) Failing to discuss any of the objective medical evidence in the record; 4) Providing inadequate reasons for rejecting Dr. Crow's opinions; 5) Providing inadequate reasons for concluding that Formentin could perform light work; 6) Failing to consider whether Formentin could perform work on a forty-hour-per-week basis; 7) Rendering an RFC finding not supported by substantial evidence. (Doc. 13 at 11-19). These arguments will be addressed in turn.

### 1.    *Formentin's Underdeveloped Arguments Are Waived*

It is well settled that where a Social Security claimant makes arguments which are "adverted to in only a perfunctory manner," those arguments "are waived." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013); *Fielder v. Comm'r of Soc. Sec.*, No. 1310325, 2014 WL 1207865, at *2 (E.D. Mich. Mar. 24, 2014).

Formentin asserts in a single sentence of her brief that "[t]he decision is so lacking in discussion or rationale it is a violation of Plaintiff's due process." (Doc. 13 at 17). This single, undeveloped reference to due process rights cannot support a claim. Formentin's counsel has made this sort of perfunctory due process argument in several prior Social Security benefits actions; such arguments have been consistently rejected. *See Gilliam v. Comm'r of Soc. Sec.*, No. 14-12335, 2015 WL 3580502, at *13 n. 4 (E.D. Mich. June 5, 2015) ("This is one of two cursory references to due process . . . and Plaintiff's brief

26

cannot reasonably be read to contain a due process claim."); *Luster v. Comm'r of Soc. Sec.*, No. 13-CV-14748, 2015 WL 1439910, at *11 (E.D. Mich. Mar. 27, 2015) ("Plaintiff's claims concerning . . . violation of her due process rights, are undeveloped and lack supporting explanation. Plaintiff . . . offers no explanation of how her due process rights were violated."). If Formentin's counsel believes that he can effectively argue that an ALJ's faulty decision supports a due process claim, he would be well advised to present substantial arguments explaining that claim. Repetition of this sort of underdeveloped argument will inevitably be met with waiver.

Formentin also makes a single reference to the requirement that "the ALJ must consider, under some circumstances, contacting the treating physician for clarification." (Doc. 13 at 14). Formentin makes no effort to establish why it would be necessary for the ALJ to contact Dr. Crow, nor which portions of Dr. Crow's records require clarification. Formentin has thus waived any argument that the ALJ erred by not re-contacting Dr. Crow.

### 2.   *Formentin's Mischaracterizations of the ALJ's Decision Do Not Support Her Claim for Remand*

The Court also notes that Formentin's brief misrepresents the contents of the ALJ's decision in several locations. Formentin asserts that the ALJ "never mentioned" that she was taking medication for her depression, yet review of the ALJ's decision shows that he noted that Formentin "treats by taking Celexa," an antidepressant. (Doc. 13 at 11; Tr. 16). Likewise, Formentin asserts that the ALJ fails to reference that she "will

27

regularly 'break down into tears for no apparent reason'" (Doc. 13 at 11-12), yet the ALJ recognizes in the decision that Formentin "testified to low mood and crying spells." (Tr. 16).

Similarly, Formentin asserts that "Step three is ignored by the ALJ entirely" (Doc. 13 at 12), whereas in reality the ALJ wrote that he "considered the listings, particularly listings 1.04 (disorders of the spine), 3.03 (asthma), and 9.00 (endocrine disorders), and determined that the claimant's impairments do not satisfy any listing" (Tr. 17).

Formentin also argues that "[t]here is no discussion of the objective medical evidence in the decision, no discussion of the factual basis for the decision, and not a single discussion in the decision of special factors such as medication side effects, fatigue, and pain in lower extremities bilaterally" (Doc. 13 at 12), and that "[t]he ALJ listed no objective medical evidence nor does the ALJ offer any analysis or insight throughout the decision into his [RFC] determination" (*Id.* at 16). This is again simply a misreading (or failure to read) the ALJ's decision. The ALJ references Formentin's complaints of pain, her estimated ability to ambulate and lift, her migraines, and breathing difficulties. (Tr. 18). In terms of objective medical evidence, the ALJ discusses in detail Formentin's treatment for back pain, including the doctors' diagnoses, the radiological evidence, the medications which she was prescribed, her numerous visits to hospital urgent care wards, her activities of daily living, her work history, and the various opinions about her residual functional capacity. (Tr. 18-21). Formentin references only two pieces of objective evidence which the ALJ allegedly ignored: positive straight leg

28

test results and reduced range of motion in the spine. (Doc. 13 at 13). Ironically, the ALJ specifically noted that Formentin "exhibited reduced range of motion in the lumbar spine, a positive straight leg raise, and a mild-right sided limp." (Tr. 19).

Formentin also argues that the ALJ did not "evaluate whether based on claimant's combined physical and mental limitations [she was] capable of a competitive work schedule i.e., 8 hour day, 40 hour work week," as required by SSR 96-8p. Yet the ALJ clearly held that "by the time of the alleged onset date in March 2014, the claimant would have been capable of full time employment, so long as certain restrictions were in order." (Tr. 21). Moreover, an RFC "is the individual's maximum remaining ability to do sustained work activities in an ordinary setting on a regular and continuing basis," which is a forty-hour work week, thus the RFC finding implicitly addresses the claimant's ability to work on a full-time schedule. SSR 96–8p, 1996 WL 374184, at *7; *see also Houston v. Comm'r of Soc. Sec.*, No. 14-14426, 2015 WL 5752720, at *18 (E.D. Mich. Aug. 25, 2015), report and recommendation adopted, No. 14-14426, 2015 WL 5729079 (E.D. Mich. Sept. 30, 2015).

Formentin likewise asserts that the ALJ "never evaluates the claimant's subjective complaints in accordance with the disability regulations pertaining to evaluation of symptoms under SSR 96-7p." (Doc. 13 at 18). This is a mischaracterization of the decision. The ALJ specifically discusses each of the factors listed in SSR 96-7p, including Formentin's daily activities; the location, duration, and intensity of her pain; factors aggravating her symptoms; the effectiveness of her medication; treatment other

than medication; and Formentin's use of certain postural positions to relieve pain. (Tr. 16-21). The ALJ discusses Formentin's average daily activities, the location and intensity of her pain, her use of narcotic pain relieving medication and injections, her physical therapy treatments, and her habit of laying down for several hours daily to relieve pain. (*Id*.).

Formentin's assertion that the ALJ "only states conclusions and never gives any reasoning throughout his decision," and that the decision is "one conclusion after another without out piece of analysis" is likewise unsupported. (Doc. 13 at 18). Formentin cannot support a claim for remand by misrepresenting the ALJ's decision.

### 3.   *The ALJ Did Not Err by Finding Formentin's Mental Impairments Non-Severe*

Formentin asserts that the ALJ erred by finding her mental impairments non-severe. (Doc. 13 at 11-12). As discussed above, Formentin mischaracterizes the ALJ's decision as including no discussion of her alleged crying spells, depressive symptoms, and use of medication to treat depression. (Doc. 13 at 11-12). Because this assertion is flatly contradicted by the ALJ's decision, it adds nothing to Formentin's argument. Formentin also asserts that the ALJ's discussion of the Paragraph B criteria, *i.e.* the four areas of functioning used to assess mental health, is "superficial and really does not evaluate anything." (Doc. 13 at 11). In reality, the ALJ's analysis is thorough and persuasive. He noted that Formentin did not attest that her depression interfered with her ability to perform personal care, prepare meals, do housework, drive, or shop; that she

30

regularly spent time with others and left the home regularly; that she had no difficulty paying attention or following instructions; and that she suffered from no episodes of decompensation. (Tr. 16). Finding no more than mild limitation in any of the four functional areas under Paragraph B, the ALJ concluded that Formentin did not suffer from any severe mental impairments. (Tr. 16). This conclusion is well supported, and Formentin points to no evidence in the record which undermines it. Furthermore, where an ALJ finds that a claimant suffers from at least one severe impairment, he is required to consider all severe and non-severe impairments in the remaining steps of the sequential process, and a finding that a particular impairment severe is legally irrelevant. *See McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008).

Formentin also argues that the ALJ should have considered the impact of her non-severe mental impairments at Step Four of the sequential evaluation, but did not reference Formentin's mental health or treatments in rendering his RFC finding at Step Four. (Doc. 13 at 12). ALJs are required to "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" Social Security Ruling 96–8p. Failure to discuss a claimant's non-severe mental impairments at Step Four can, in some circumstances, merit remand. *See Hicks v. Comm'r of Soc. Sec.*, No. 12-13581, 2013 WL 3778947, at *3 (E.D. Mich. July 18, 2013). The ALJ's failure to account for Formentin's mental impairments at Step Four comports with common sense, given that Formentin herself and her physicians placed very little emphasis on her mental health. For instance, in her function report Formentin asserted that she was disabled due to "lower back

31

injury," pain, and a lifting restriction, not due to any mental health limitations. (Tr. 226).

Likewise, Formentin responded to a question about her ability to count money by writing

"no does not apply," wrote that she followed instructions "very well," and as regards her

concentration abilities, wrote "attention span is good no problem." (Tr. 230-31).

Formentin's sole assertion of mental health dysfunction in her function report is a

statement that she does not "handle stress well," and due to stress has developed an ulcer.

(Tr. 232). Likewise, as the ALJ noted, very few of Formentin's records relate to mental

health treatment, she did not treat with a mental health professional, and no physician

opined that Formentin was disabled due to a mental impairment. (Tr. 16). Indeed,

complaints of mental limitations or ailments are almost entirely absent from the record.

Formentin points only to her subjective complaints of experiencing stress and occasional

bouts of crying at the oral hearing, and the ALJ found no more than mild impairment at

Step Two.

Furthermore, several courts in this district have found that an ALJ does not err by

choosing not to include mild mental limitations into their RFC finding. *Burrell v.*

*Comm'r of Soc. Sec.*, No. 14-14529, 2016 WL 1165994, at *10 (E.D. Mich. Feb. 29,

2016), report and recommendation adopted, No. 14-14529, 2016 WL 1161548 (E.D.

Mich. Mar. 23, 2016); *Boley v. Astrue*, No. 11-10896, 2012 WL 680393, at *14 (E.D.

Mich. Feb. 10, 2012), report and recommendation adopted, No. 11-CV-10896, 2012 WL

680392 (E.D. Mich. Mar. 1, 2012); *but see Hicks v. Comm'r of Soc. Sec.*, No. 12-13581,

32

2013 WL 3778947, at *3 (E.D. Mich. July 18, 2013) (remanding for failure to discuss mild mental limitations at Step Four).

Even assuming that the ALJ erred by not duplicating his discussion of Formentin's mental health at Step Four, such error would be harmless. Even where "an agency has failed to adhere to its own procedures," remand is not appropriate "unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (quotation omitted). The ALJ's error here could be remedied by simply referencing his Step Two findings at Step Four. Formentin cannot be found to have suffered any prejudice as the result of this failure. While there may be times when it is wise to strictly apply the rule that non-severe conditions be discussed at Step Four, this is not that case. Where a claimant does not allege disability resulting from mental impairments, hardly mentions mental issues in her function report, testifies to only intermittent and mild symptoms related to mental health, and does not point to any evidence which the ALJ failed to consider, remand would be nothing more than a useless formality.

### 4.    *The ALJ Did Not Err at Step Three*

Formentin next argues that the ALJ erred at Step Three of the sequential evaluation process. As noted above, Formentin's assertion that the ALJ "ignored . . . entirely" Step Three is simply false, and lends no credence to her argument. (Doc. 13 at 12). It is true that the ALJ's Step Three finding is brief, and simply names three listings

which the ALJ considered, along with his finding that Formentin did not meet those listings. (Tr. 17). "However, it is well-settled that the Court may look at the rest of the ALJ's decision in order to determine whether substantial evidence supports the ALJ's Step Three determination." *Smukala v. Comm'r of Soc. Sec.*, No. 15-10612, 2016 WL 943953, at *10 (E.D. Mich. Feb. 23, 2016), report and recommendation adopted, No. 15-CV-10612, 2016 WL 931161 (E.D. Mich. Mar. 11, 2016); *Gower v. Comm'r of Soc. Sec.*, No. 13-14511, 2015 WL 163830, at *9 (E.D. Mich. Jan. 13, 2015) (holding that an ALJ does not err where his Step Three findings are supported by findings at Step Four). The ALJ mentioned all of the relevant evidence in his Step Four analysis relating to Formentin's spine disorders, asthma, and diabetes, including referencing the opinions of Dr. Harwood, the consultative examiner, Dr. Wozniak, and Dr. Crow. (Tr. 18-21).

Claimants bear the burden of proof at Step Three "to bring forth evidence to establish that he or she meets or equals a listed impairment." *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1272 (6th Cir. 1995). Formentin points to no evidence demonstrating that she meets any listing, thus she has not met her burden, and the ALJ's Step Three finding stands.

### 5.    *The ALJ's RFC is Not Supported by Substantial Evidence*

Formentin next argues that the ALJ provided inadequate reasons for concluding that she could perform light work. (Doc. 13 at 14). Similarly, Formentin argues that the ALJ failed to provide good reasons for rejecting Dr. Crow's proposed limitations, and

34

that the ALJ rendered an RFC finding not supported by substantial evidence. (*Id*. at 13-18).

The ALJ discussed all of Dr. Crow's pertinent findings rendered between 2012 and 2014, including that she should be limited to thirty-two hours of work per week in addition to postural and lifting restrictions. (Tr. 21). The ALJ accorded some weight to Dr. Crow's opinions, but found that Formentin's condition improved over time, thus Dr. Crow's restrictions were not consistent with Formentin's level of disability in March 2014. (*Id*.).

Formentin does not point to specific objective evidence which she finds inconsistent with this opinion, but rather calls it "bizarre . . . nonsense," asserts that the ALJ does not give "specific reasons" for according less weight to Dr. Crow's opinions, and suggests that "the objective medical evidence" generally supports Dr. Crow's opinions. (Doc. 13 at 13-15). This sort of underdeveloped argumentation comes dangerously close to waiver. Nevertheless, the Court will consider whether the ALJ provided the requisite good reasons for affording less than controlling weight to Dr. Crow's opinions.

It is difficult to summarize Formentin's lengthy medical history, but the Court nevertheless attempts to focus on some of her more important findings below. The medical evidence shows that Formentin suffered significant misalignment of the spine as the result of an April 2012 car accident, including reversal of the cervical lordosis with anterolisthesis at C2-C4. (Tr. 265). She complained of six out of ten pain the day

following the crash. (Tr. 264). She attempted to work in May 2012, but found it difficult to sit. (Tr. 268). She also experienced eight out of ten pain and regular low back spasms at that time. (Tr. 269). In July 2012 Formentin complained of ten out of ten pain, but was able to return to work with postural, lifting, and hour restrictions. (Tr. 309). In August 2012 she reported extreme pain, and spent her weekends lying in bed crying due to pain. (Tr. 311). Dr. Crow noted that Formentin's pain was not responding to conservative therapy. (*Id.*). In September 2012 she had difficulty walking, fell at home, and was taking three Norco pills daily. (Tr. 316). While injections provided some pain relief in October 2012, the relief wore off after about two weeks. (Tr. 303). Formentin was able to work thirty-two hours per week with restrictions, but missed some days due to pain. (*Id.*). She was in eight out of ten pain at that time. (*Id.*). In December 2012 she was diagnosed with lumbar radiculopathy, sacroiliitis of the right joint, and disc degeneration. (Tr. 327, 330). She complained of severe pain despite use of four narcotic pain medications and a TENS machine. (Tr. 329).

Formentin continued to experience nine out of ten pain in January 2013, and had further episodes of falling. (Tr. 333). Dr. Harwood noted that Formentin's pain was persistent and had exacerbated over time. (Tr. 408). Formentin again fell in March 2013; physical therapy was of little benefit, and her ability to walk, lift, and sit was reduced. (Tr. 394, 404). She was found to have a broad based disc protrusion at L2-L3 without root compression. (Tr. 274). In March 2013 Dr. Harwood noted that Formentin's pain was moderate in severity. (Tr. 420). In May 2013 Formentin reported to Dr. Crow that

her pain had not resolved and was at nine out of ten in severity. (Tr. 337). She was able to work, go to school, and helped her father move at that time. (*Id*.). Formentin was found to have partially met her physical therapy goals, but continued to report nine out of ten pain. (Tr. 396). She suffered a fall and sought hospital treatment that month. (Tr. 557). Her pain treatments were found to be ineffective, but she was cleaning her father's house against medical advice. (*Id*.).

In May 2013 Dr. Harwood noted that Formentin's aching pain was worsening over time, and had reached a "moderate to severe" level. (Tr. 422).  She sought hospital treatment in June 2013 for extreme pain following long distance driving and "working a lot" (Tr. 580), but was denied further pain medication due to her "extremely low risk" diagnoses (Tr. 573). She again sought hospital treatment in July 2013 due to difficulty walking from severe leg pain, and was noted to be using at least two narcotic pain relievers in addition to pain relieving injections at that time. (Tr. 341). She was still working thirty-two hours weekly, but complained of leg pain at nine out of ten severity. (Tr. 343). In July 2013 she sought hospital treatment for ten out of ten pain, but it was found that her pain was not progressively worse. (Tr. 585). In August 2013 Dr. Harwood limited Formentin to working thirty-two hours per week and lifting no more than fifteen pounds as the result of her continuing pain. (Tr. 425). She sought treatment at urgent care clinics for her pain numerous times throughout the record. (Tr. 426-555).

Formentin was using multiple doses of narcotic pain relief medication daily in January 2014, and sought hospital treatment for pain and migraines. (Tr. 597, 680). A

37

March 2014 MRI showed levoscoliosis with advanced degenerative disc disease at L2-L3, along with bulging discs which were unchanged since the prior study in 2012. (Tr. 758). In April 2014 Dr. Harwood noted that Formentin's pain was unchanged (Tr. 637), yet Dr. Crow noted that same month that her pain had increased (Tr. 688). Even the use of morphine and Valium together provided only temporary relief. (Tr. 717). She withdrew from college classes due to back pain. (*Id*.). In July 2014 Dr. Crow found that Formentin was functioning at only twenty-five percent of her normal capacity, and could "barely move without falling." (Tr. 760). He found that she would require twelve hours per day of attendant care through July 16, 2015. (Tr. 761). In August 2014 Dr. Eltahawy found that Formentin's pain was progressively worsening, along with advanced degenerative process at L3-L4. (Tr. 780). Also in August 2014, Dr. Geoghegan found that Formentin could sit or stand for twenty minutes, walk less than one block, carry up to twenty pounds occasionally, and during the workday could sit or stand for four hours, and walk for two hours.

In contrast, the ALJ found, in relevant part, that Formentin could lift up to fifteen pounds occasionally, required a sit/stand option every thirty minutes, and could perform "light work," meaning that she could stand or walk for about six hours per eight-hour workday. SSR 83-10. Even considering Dr. Geoghegan's consultative analysis, it is difficult to see how a claimant who suffers regular falls and severe pain on bending would be capable of occasionally climbing ramps and stairs, balancing, stooping, kneeling, and crouching. (Tr. 17). As both of the positions identified in the ALJ's

38

decision are "light" in exertion, they would require standing and walking for six out of eight hours. It is implausible that Formentin could perform this level of ambulation given her right leg pain, spine pain, and episodes of falling.

The Court also finds that the ALJ erred by finding that Formentin's symptoms reduced rapidly with medication and experienced a moderate improvement over time. (Tr. 19-21). Review of the medical evidence shows a general trend of worsening pain (Tr. 343, 408, 422, 585, 688, 780), an increasing tendency to suffer falls (Tr. 333, 557, 760), and numerous hospital visits throughout her treatment record (Tr. 441, 573, 575, 597). The record indicates that Formentin struggled to get relief from even very potent narcotic pain medication, and was often prescribed multiple narcotics to be taken in conjunction, which provided only some relief. (Tr. 329, 680). Perhaps most distressingly, Formentin testified at the hearing that she could no longer take pain medication due to an ulcer; where her numerous, medications did little to remedy her pain, it is difficult to conceive how she could perform full time work when operating without any pain medication. (Tr. 41).

The ALJ's credibility findings similarly misconstrue the evidence. While it is true that Dr. Crow once found a "disconnect in terms of how much she is doing compared to how much pain she is in" (Tr. 337), it is not clear that Dr. Crow intended this finding to besmirch Formentin's credibility. Particularly where Dr. Crow continued to treat Formentin through 2014, and continued to find that Formentin was only able to perform a limited set of activities which would preclude her from full time work, his note may

39

merely have grown out of concern for Formentin overexerting herself, rather than a belief that she was overstating her pain. While working part-time, going to school, and helping someone to move is surely an active lifestyle, Formentin did not maintain this level of activity after May 2013. (Tr. 337). By April 2014 Formentin had ceased taking classes and working due to her back pain. (Tr. 15, 717).

Furthermore, the ALJ's finding that Formentin engaged in "wide-ranging activities of daily living" overstates the record. (Tr. 20). Performing personal care, preparing simple meals, doing small household cleaning tasks, spending time with others, occasional shopping, and attending church are not the sort of activities which clearly demonstrate the ability to complete competitive work, and are not inconsistent with Formentin's asserted symptoms. The ALJ's finding likewise draws little support from the single medical record noting that Formentin was "exercising," given that the medical note does not describe the type or extent of her exercise. (Tr. 20, 424).

The ALJ may have been "persuaded that, by the time of the alleged onset date in March 2014, the claimant would have been capable of full time employment" (Tr. 21), but the medical evidence simply does not support that conclusion. It is unfortunate that, given these deficiencies in the ALJ's decision, Formentin's brief focuses so heavily on non-meritorious arguments, and does so little work in comparing the facts of Formentin medical record to the ALJ's findings. In spite of Formentin's poorly argued brief, the Court finds that remand is appropriate.

40

**6.      *Remand for Benefits is Appropriate***

Once it has been determined that the Commissioner's administrative decisions are not supported by substantial evidence, a district court faces a choice. It may either remand the case to the Commissioner for further proceedings or direct the Commissioner to award benefits. The court may reverse and direct an award of benefits if "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits . . . where the proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Felisky*, 35 F.3d at 1041; accord, *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir.1994). This comports with the principle that "where remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game." *Wilson v. Comm'r of Soc. Sec.*, 378 F3d 541, 547 (6th Cir.2004) (citations omitted).

In this case, the Court finds that the ALJ simply overstated the records. He found improvement in symptoms where the medical records suggest the inverse, found that Formentin engaged in a wide range of activities of daily living whereas in reality she performed only a limited set of low intensity activities, and found that she would be able to perform work at a light level of exertion despite evidence that Formentin is unable to walk without regular falls and experiences tremendous, uncontrolled pain on a constant basis. Upon review of the records, the Court finds that proof of Formentin's disability is overwhelming, thus remand for benefits is appropriate.

41

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Formentin's Motion for Summary Judgment (Doc. 13) be **GRANTED**, the Commissioner's Motion (Doc. 15) be **DENIED**, and that this case be remanded for an award of benefits.

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party

42

may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  April 19, 2016                    S/ PATRICIA T. MORRIS
                                         Patricia T. Morris
                                         United States Magistrate Judge

**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: April 19, 2016                     By s/Kristen Krawczyk
                                         Case Manager

43